**DONOVAN CONSTRUCTION COMPANY OF MINNESOTA, a Minnesota corporation, Plaintiff,**

v.

**Joseph L. WOOSLEY et al., Defendants.**

**No. HS–71–C–22.**

United States District Court, W. D. Arkansas, Hot Springs Division.

May 11, 1973.

Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., Henson & Faubus, Little Rock, Ark., for plaintiff.

Wright, Lindsey & Jennings, Little Rock, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge (Sitting By Designation).

This action was tried to the court on March 29, 1973, and at the conclusion of the evidence the court directed that the parties submit memoranda in support of their respective contentions and their version of the facts as established by the evidence. The post trial memoranda have been received and considered by the court.

The suit was commenced October 5, 1971, seeking judgment against the defendants in the amount of $85,000 and costs.

The parties admit that Donovan Construction Company of Minnesota is a Minnesota corporation with its principal place of business at St. Paul; the defendants Joseph L. Woosley and Clarence W. Jordan are citizens of the State of Arkansas with their principal place of business at Hot Springs, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

Jurisdiction is granted by 28 U.S.C.A. § 1332. The rights of the parties are determined and fixed by the substantive law of Arkansas.

### Complaint

The plaintiff in its complaint alleged: That at times relevant hereto Inland Contractors, Inc. (Inland), and Newkirk Contractors, Inc. (Newkirk), were Arkansas corporations engaged in the construction business; that Larry J. Newkirk and Jeffery D. Newkirk were the stockholders and principal executive officers of Inland and Newkirk. That defendants Jordan and Woosley were acting as Certified Public Accountants for Inland and Newkirk and in such capacity prepared and issued certified financial statements of Newkirk dated April 30, 1966, April 30, 1967, and June 30, 1968, each of which reflected and listed as one of the assets of Newkirk certificates of deposit in the amount of $85,000.

That on March 27, April 4, and November 26, 1968, plaintiff entered into certain financing agreements with Inland whereby plaintiff agreed to provide financial assistance to Inland for the purpose of obtaining and completing construction contracts for the Camden School District, Camden, Ark., the Jacksonville School District, Jacksonville, Ark., and the Board of Trustees of Southern State College, Magnolia, Ark.

That the individual Newkirks agreed to indemnify and hold plaintiff harmless from any loss by reason of said agreements, and in order to induce plaintiff to enter into said agreements with Inland and to accept their personal guarantees and indemnifications, the Newkirks delivered to plaintiff their personal financial statements prepared by defendants; that in entering into said agreements with Inland, plaintiff relied upon the financial statements of the Newkirks and "specifically upon the 'Certificates

of Deposit' in the amount of $85,000 as assets of Newkirk as reflected in the Newkirk statements."

That by reason of entering into said agreements with Inland, plaintiff sustained losses in excess of $450,000, and the individual Newkirks have failed to make good such losses.

That defendants represented that the certificates of deposit in the amount of $85,000 constituted current assets of the Newkirks and that they, the defendants, had utilized generally accepted auditing standards in examining and preparing the financial statements of Newkirk and that such financial statements fairly represented the financial position of the corporation; that such statements constituted false representations of material facts and that said defendants either knew or should have known that their representations were false; that in releasing said statements the defendants fully intended and expected that members of the business community would rely upon their representations in conducting their business affairs.

In paragraph IX the plaintiff further alleged that the defendants failed to exercise due care and diligence in examining the books and records of Newkirk and in making false and fraudulent representations in the financial statements prepared by them, and that defendants "also failed to utilize auditing standards, procedures and tests reasonably necessary to ascertain whether said financial statements presented a reasonably accurate financial picture of Newkirk; such negligence proximately caused damage to plaintiff, as hereabove set forth."

### Answer

On October 26, 1971, the defendants filed their answer in which they admit-

ted that they had prepared the certified financial statements dated April 30, 1966, April 30, 1967, and June 30, 1968, but denied all allegations of negligence in the preparation of said statements, and in paragraph 6 of their answer alleged that the statements "were true and correct and that these defendants utilized generally accepted auditing standards in examining and preparing the financial statements of Newkirk Contractors, Inc. Any allegations of misrepresentation on the part of Jordan & Woosley are completely false."

In paragraph 9 of the answer the defendants stated:

"Defendants deny the allegations contained in Paragraph IX of the complaint. They deny that they failed to exercise due care and diligence, and they deny that any false and fraudulent representations were made. They state that the auditing standards, procedures and tests used by them were proper, and they deny that they were negligent in any way, shape or form."

On October 2, 1972, the defendants filed an amendment to their answer, in which they alleged:

"1. Plaintiff's complaint is barred by the Arkansas statute of limitations, Ark.Stat. § 37–206.

"2. Plaintiff's complaint fails to state a cause of action against defendants because defendants were not in privity with plaintiff and plaintiff did not and could not have justifiably relied upon the alleged misrepresentations."[1]

### Summary of Contentions

The plaintiff contends: (1) that the defendants failed to adhere to the generally accepted accounting standards and practices in auditing the books and rec-

1. On November 27, 1972, the court by letter stated to the attorneys that in the ordinary case the plea of the statute of limitations and lack of privity raises questions of law. Counsel were requested to proceed to submit memorandum briefs in support of their respective contentions on these two questions. In ac- cordance with the above request, the attorneys proceeded to serve and file pretrial memoranda which the court considered, and advised counsel that action on the special pleas made in the amendment to the answer would be deferred until the trial of the case upon its merits.

ords of Newkirk, and in issuing a series of certified financial statements reflecting certificates of deposit in the amount of $85,000 as a principal and unencumbered asset of Newkirk; (2) that the defendants knew that generally accepted auditing practices and procedures required visual inspection of the certificates in question; (3) that defendants failed to visually inspect the certificates of deposit; (4) that plaintiff reasonably relied upon the statements and various representations contained in the statements and certification letters; and (5) that plaintiff sustained substantial damage as a result thereof.

In the opening paragraph of defendants' post-trial memorandum, they state:

"Defendants concur with plaintiff's recitation of the elements required to sustain its case here. Defendants vigorously deny that plaintiff has proved any one of those elements, except that it suffered a loss in its business transactions with Inland Contracting, Inc. Specifically, defendants deny that their accounting firm failed to adhere to generally accepted standards in conducting audits and deny that plaintiff relied or had any right to rely on the out-of-date financial statements of April 30, 1966, April 30, 1967 and June 30, 1968. Finally, defendants suggest that the arguments set forth in pre-trial memoranda on privity and the statute of limitations apply squarely and precisely to the undisputed facts developed in the trial and touching upon these issues."

At the close of the evidence the court suggested that counsel submit memorandum in support of their contentions, and stated that it would in the consideration of the case and decision, if necessary, consider the questions of law raised in the amendment to the answer along with the facts as established by the evidence.

Ordinarily the court would consider seriatim the contentions of plaintiff, but contentions 1, 2 and 3 are so closely related that it appears necessary to avoid repetition that the first three contentions be considered together. Likewise, contentions 4 and 5 will be considered together.

Upon a consideration of all the evidence, which, of course, includes the exhibits, the court finds the facts as follows.

### Findings of Fact
### Contentions 1, 2, and 3

■ The defendant Jordan was practicing his profession at Hot Springs prior to the organization of the partnership of Jordan & Woosley, Certified Public Accountants, and had done the accounting work for the Newkirks, while they, father and son, were operating as a partnership. When Jordan first began doing the accounting for the Newkirks, they owned two certificates of deposit totaling $40,000 issued by the White Rock National Bank of Dallas, Texas. Newkirk Contractors, Inc., was incorporated in August 1965, and Mr. Jordan prepared the opening entry and set up the books. At that time the corporation was capitalized at $50,000, a single certificate of deposit issued by the Worthen Bank & Trust Company for $50,000 which Mr. Jordan visually inspected.

The first contact of Woosley with Newkirk was in the preparation of the April 30, 1966, audit, which listed as assets two certificates of deposit issued by Worthen Bank & Trust Company to Newkirk, No. 5433 for $50,000 representing the original capital stock, and No. 5451 for $35,000 covering the increase in the capital stock. The certificates were visually examined by Mr. Woosley and verified by Worthen Bank & Trust Company on May 11, 1966.

The next audit was made as of April 30, 1967, by Mr. Woosley. Again the two CD's were visually examined by Woosley and verified by Worthen Bank & Trust Company.

The first two audits, April 30, 1966, and April 30, 1967, were compiled for the purpose of making an annually required filing with the Contractor's Licensing Board for renewal of license due

in May of each year. The 1966 application was filed on May 12, 1966, and appears as plaintiff's exhibit 11. The 1967 application was filed June 20, 1967.

The June 30, 1968, audit was delivered to Newkirk on August 9, 1968. It listed two CD's ($85,000) as "savings." Exhibit 9, the work papers of Mr. Woosley, shows the existence of the CD's were verified. On July 24, 1968, the Worthen Bank & Trust Co. advised the defendants that the CD's were on deposit to the credit of Newkirk and that the depositor was not contingently liable as endorser of notes, discounted and/or as guarantor at the close of business on that date (P. Ex. 10).

The last sheet of the audit of June 30, 1968, showed:

> "*Newkirk Contractors, Inc.*
> *Statement of Retained Earnings*
> *June 30, 1968*
> "Balance—June 30, 1967
>    (deficit)     $(51,403.57)
> Add:
>   Net Income for the
>     year ended June 30,
>     1968     38,610.20
> Balance—June 30, 1968
>    (deficit)     $(12,793.37)"

Attached to each of the audits is a certificate of the defendants to the effect that the examination was made in accordance with generally accepted auditing standards, including such tests of the records as they considered necessary in the circumstances, and that each audit was prepared in conformity with generally accepted accounting principles.

Newkirk was receiving interest each year on the certificates.

No witness testified that the defendants did not visually examine the CD's on each and every examination made by Mr. Woosley, whose testimony was given several years after the audits were compiled, but he said his very best recollection was that he did actually visually inspect the certificates. He was wholly corroborated by the Newkirks and partially by the records of the bank.

The plaintiff introduced Mr. Booker Worthen of the Worthen Bank & Trust Company in an effort to establish that a visual inspection was never made of the CD's, but a reading of his testimony discloses that he was not always in charge, and it is perfectly clear that he did not have first-hand knowledge of what occurred. He did not testify that he knew personally either that the certificates were retained in the bank at all times or that they had been endorsed. His only testimony was as to the bank's custom. Some of the collateral records introduced in support of Worthen's testimony show that the CD's were received as collateral many days after the CD's had been issued or reissued. He undertook to explain this by saying that it took some time for inter-bank transactions to take place. He also stated that there were "about ten" other officers in the Note Department who had access to the collateral vaults.

The court does not impugn Mr. Worthen's honesty but his testimony as a whole falls far short of proving that these CD's never left the bank during the years in question. In fact, plaintiff's Exhibit 17, designated "Collateral Record," shows that the $35,000 certificate was received by Jeff D. Newkirk on November 22, 1967. Other "Collateral Records" show that various notations were made on them which were not fully explained. Mr. Jeff D. Newkirk testified positively that he obtained and delivered the CD's to Mr. Woosley while he was compiling each and every one of the audits.

The plaintiff introduced Mr. Robert B. Berryman, who stated his opinion as to what a CPA must do in preparing an audit, and that visual inspection of documents was necessary in this case because the corporation involved was weak.

The defendants introduced Mr. Ernest White, who has had much experience in private accounting, governmental accounting and academia. Mr. White testified positively that visual examination was not necessary at all times. However, visual inspection is one of the rec-

ommended audit procedures, but in his opinion there were many instances where it might not be necessary to visually examine the documents and that the auditor could use other audit procedures to verify the existence of the revenues and the valuation.

Upon a consideration of all the evidence, including the many exhibits, the court is convinced that the defendants adhered to generally accepted accounting standards and practices in auditing the books and records of Newkirk. There was no contention that the defendants were not fully qualified as expert accountants, and the real contention of the plaintiff is that the audits are not reliable because of a doubt in the minds of the officers of the plaintiff that Mr. Woosley had personally viewed the CD's. The court is convinced that he did personally view them, and he used other audit procedures to verify the existence of the revenues and valuations placed thereon.

### Contentions 4 and 5

In contention 4 plaintiff contends that it reasonably relied upon the statements and various representations contained in the statements and certified letters. In contention 5 plaintiff contends that it sustained substantial damage as a result of such reliance.

On October 5, 1966, plaintiff wrote Newkirk outlining its plan by which together they could bid additional projects in the Arkansas area. On October 14, 1966, Newkirk wrote plaintiff and advised that it found its plan to be most acceptable and stated that it was anxious to complete the necessary arrangements in order to bid on certain projects named in the letter. The letter gives a history of Newkirk and lists contracts successfully completed by Newkirk from 1955 to 1966. It also names the principal employees of Newkirk and outlines their duties (P.Ex. 1–A).

At the time the letter of October 14, 1966, was written apparently Inland Contractors, Inc., had not been organized,

but was evidently organized soon thereafter, but the plaintiff introduced no evidence showing who the organizers were other than the Newkirks, father and son, were stockholders along apparently with others.

Mr. John Dunderi, the accountant for plaintiff, a CPA, testified that the first contract between Inland and plaintiff was entered into in the fall of 1967. He could not give the date of the contract, but that was evidently the contract for the construction of the Henderson High School, which was successfully completed at a substantial profit to plaintiff. The only contracts that were introduced are as follows:

The first was a financing agreement dated March 27, 1968, between plaintiff and Inland, apparently a Louisiana corporation, relative to the construction of Jacksonville High School, Jacksonville, Ark., together with performance and payment bond and insurance policies (P. Ex. 22, 23, 24). The second contract, another financing agreement, was dated April 4, 1968, relative to the contract with the Camden School District, Camden, Ark., to which was attached copy of performance and payment bond, insurance policies and indemnity agreement (P.Ex. 25, 26, 27). The third contract was designated as a joint venture agreement between plaintiff and Inland, dated November 26, 1968, and covers the construction of a laboratory building on the campus of Southern State College, Magnolia, Ark., together with performance and payment bond, uncertified personal financial statement of Jeff D. Newkirk and Larry Newkirk, and an indemnity agreement (P.Ex. 28, 29, 30, 31, 32, 33).

Plaintiff's exhibit 13, compiled by defendants as of October 31, 1969, and furnished to Newkirk on December 1, 1969, contains the following statement:

"We have prepared the balance sheet of Newkirk Contractors, Inc. as of October 31, 1969 and the related statement of income for the four months period then ended.

"In our audit report dated June 30, 1969 we showed cash in the bank of $84,735.73. This amount was made up of $85,000.00 of Certificates of Deposits with the Worthen Bank & Trust Co. in Little Rock, Arkansas less a net overdraft in the other bank account of $264.27. According to Worthen's records checks were issued as follows to redeem these certificates:

| | |
|---|---|
| 8–09–69 | $ 35,000.00 |
| 8–22–69 | 50,000.00 |
| | $85,000.00 |

"These checks were not deposited in any of the company's bank accounts. We have not received a satisfactory explanation from the corporate officers as to the disposition of these funds and have therefore charged this amount as loans receivable from officers.

"Since this is a material item in the balance sheet we are unable to render an opinion as to the fairness of the accompanying statements."

In his testimony Mr. Dunderi frankly admitted that the plaintiff in entering into these contracts was relying on a great deal more than the financial statements upon which this lawsuit is based.

Neither Newkirk Contractors, Inc., nor the individual Newkirks were parties to any of the three contracts listed above, but the plaintiff required personal financial statements from Jeff and Larry Newkirk, which were not certified to by defendants. Those statements showed the existence of various substantial assets, but no mention was made of the capital stock that the Newkirks originally owned in Newkirk Contractors, Inc. In other words, the plaintiff introduced no testimony to establish the exact relationship between Newkirk Contractors, Inc., or the individuals and Inland. So far as the record shows, the plaintiff did not do any business with the Newkirks or the Newkirk Contractors, Inc., subsequent to the completion of the Henderson High School heretofore referred to, and it is only by an elaborate three-stage process, not fully explained, that plaintiff could be said to be looking to the assets of Newkirk Contractors, Inc.

Mr. Dunderi was equally candid in admitting that the successful completion of the Henderson High School at a substantial profit to Donovan was an incentive to continue the plaintiff's relationship with Inland.

On the three contracts upon which plaintiff claims to have suffered damages, the burden was cast upon Inland to perform the contracts under strict regulations from plaintiff. In entering into the November 26, 1968, contract, plaintiff claims to have relied on statements shown in the various balance sheets hereinbefore referred to, but those statements, respectively, were 31, 19 and 5 months old, and only one of those was a year-end statement, and the most recent statement showed the existence of a certificate of deposit which had matured before the date of the transaction in question.

Throughout the entire period of the dealings between plaintiff and the Newkirks and Inland, the plaintiff had accountants in Hot Springs on numerous and various occasions. None of those accountants made any inquiries about the certificates of deposit. None were instructed so far as the defendants know to inspect or did inspect the certificates. No contact of any kind was made by plaintiff's accountants until the fall of 1969, when the disappearance of the CD's had already been noted by the defendants.

The financial statements show that the retained earnings of the corporation had dropped dramatically between the date of the first financial statement and the third. Those earnings are shown on plaintiff's exhibits 1, 5 and 8, as follows:

| Date | Retained Earnings |
|---|---|
| 4–30–66 | $ 12,500.00 |
| 4–30–67 | (2,287.91) |
| 6–30–68 | (12,793.37) |

In addition, the stockholders' equity had dropped from $87,250.90 on April 30,

1966, to $62,206.63 on June 30, 1968. Donovan did not take any precautionary measures of any kind or character in considering the decline in the assets, although it could have taken possession of the certificates as a condition of business relationships, but Mr. Dunderi revealed in his testimony that no precautionary step was ever considered.

The plaintiff knew that a certificate of deposit as an asset of a corporation may change from day to day, and that the existence of such a certificate on a particular day does not in any way imply that it will exist on the next day. The certificates in this case state "no interest after maturity." The payee thus has a strong incentive to cash these certificates promptly. He may replace such a certificate with another one, but such possibility cannot in any way be inferred from a notation of a certificate's existence on a balance sheet.

The court is convinced that the plaintiff did not rely upon the balance sheets compiled by the defendants, and certainly in view of the condition of the business and the progress that it was making, it was not reasonable for the plaintiff to rely upon the various personal financial statements made by the Newkirks and the representations contained in their various letters and transactions leading up to the execution of the three contracts in question.

The plaintiff, when it first contacted the Newkirks, simply wanted to extend its business, and when they made a substantial profit on the Henderson High School job, they decided upon the course of conduct which they followed and which they now claim resulted in sustaining substantial damage.

In this connection (contention 5), the plaintiff has probably sustained damages, but the court is unable to find anything in the record that would justify charging that damage to the defendants.

## Conclusions

The Supreme Court of Arkansas has not discussed or decided the issues sub judice, and so far as the court has been able to determine, none of the state trial courts have considered the questions involved herein.

The facts show conclusively that the balance sheets or audits, if you classify them as audits, disclose as fully as possible the financial condition of the defendants' clients. The defendants followed the generally accepted auditing practices and visually inspected the CD's. In fact, there is no contention that the CD's were not actually in existence and the property of the clients of defendants.

It is clearly established by the evidence that the plaintiff did not rely upon the statements certified to by the defendants, but used its own judgment in determining to enter into the three contracts that it claims resulted in financial loss to it. It is not controverted that the plaintiff actually suffered loss in the three contracts, but the evidence does not establish the loss was occasioned by any action or nonaction on the part of the defendants, and therefore the plaintiff has failed to establish any liability on the part of the defendants.

There was no privity of contract between the defendants and plaintiff, and plaintiff made no investigation of the actual financial condition of the Newkirks either while operating as a partnership or as a corporation, but entered into the fatal contracts, not with the Newkirks, but with Inland, without requiring any evidence whatsover to establish the actual condition of Inland. This leads the court to believe that the plaintiff, having made a substantial profit on the construction of the Henderson School building, reached the opinion that the chances for profit on the three contracts involved herein were so certain and great, that it was willing to enter into a joint venture with Inland, and suffered a loss, which it is now seeking to partially recover by its claims against the defendants.

Following the trial of the case on the merits, eminent counsel for plaintiff served and submitted an exhaustive memorandum in support of its contentions heretofore set forth. In the memo-

randum they discussed the evidence and argued that under the facts in the case as established by the evidence, plaintiff was entitled to recover either on the theory of negligence or on constructive fraud. They cited many decisions in support of these theories that the court has examined, which in my opinion do not constitute any basis for recovery upon the facts as found by the court and as established by the evidence. Thus it is unnecessary for the court to discuss those decisions.

The only reference to fraud on the part of the defendants in plaintiff's complaint is the statement contained in the last paragraph of the complaint:

"That Jordan and Woosley failed to exercise due care and diligence in examining the books and records of Newkirk and making false and fraudulent representations contained in the financial statements referred to above."

The allegation is not sufficient to raise the question of whether defendants were guilty of fraud. Fraud is never presumed, and must be particularly pleaded and established by clear and convincing evidence. Since defendants were not negligent, fraud, actual or constructive, cannot be inferred.

In an annotation beginning at page 979 of 46 ALR3d, the annotator has collected and discussed all those cases dealing with the civil liability of an independent public accountant to parties other than his immediate client, who claimed to have been damaged as a result of reliance upon accounts or audits prepared by the accountant for his client.

In an article written by Frederick A. Carroll, of Los Angeles, Calif., and appearing in the April 1966 Insurance Counsel Journal, the author stated at page 252:

"It is generally recognized that an accountant may be held liable on principles of negligence to one with whom he is in privity or with whom he had a direct contractual relation for damages which naturally and proximately result from his failure to employ the degree of knowledge, skill, and judgment usually possessed by members of that profession in the particular locality."

After discussing various questions that arise, the learned author concludes the article on page 255 as follows:

"Accountants are playing an ever-increasing role in the life of American business. If courts do extend their sphere of liability, it should be regarded as a tribute to the important part they are playing in corporate affairs and as a burden that they must accept as a part of the widespread reliance that is placed upon them.

"So much for conjecture as to what the future might bring. As of the present time, the courts have not extended an accountant's liability for his ordinary negligence to third parties not in privity with the accountant. The theory of Hedley Byrne, the Restatement of the Law of Torts, and the extension of liability for breach of warranty has not been extended to accountant's third party liability. It may well be that *Ultramares*, 255 N.Y. 170, 174 N.E. 441 (1931), which has stood the test of three and one half decades, will still be the leading authority on third party liability for many years to come."

As heretofore stated, during the pleading stage the defendants by amendment to their answer pleaded the statute of limitations, Ark.Stat.Ann., § 37-206 (1962 Repl.), and that the complaint fails to state a cause of action because defendants were not in privity with plaintiff, and plaintiff could not have justly relied upon the misrepresentations. In view of the facts and the conclusion reached by the court, it seems unnecessary for the court to consider or determine whether the claim of plaintiffs was barred by the state statute on the date that the complaint was filed on October 5, 1971, or that privity is an essential element of plaintiff's claim. See: Talpey v. Wright, 61 Ark. 275, 32 S.W. 1072 (1895); Adams v. Greer, (W.D.Ark. 1953) 114 F.Supp. 770.

384

Therefore the complaint of the plaintiff should be dismissed, and judgment is being entered today dismissing the complaint of the plaintiff and adjudging costs against plaintiff.