Thomas E. ROBERTSON, Jr., As Trustee of the Farmer's Co-Op of Arkansas and Oklahoma, Inc.; Bob Reves; Frances Graham; Robert H. Gibbs, individually; Robert H. Gibbs, as natural guardian of his minor children Thomas A. Gibbs and Robert H. Gibbs, Jr.,; and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds, Plaintiffs, and Intervening Plaintiffs

v.

Jack E. WHITE; J.E.W., Inc.; Valley Feeds, Inc.; Gene Kuykendall and Fred Kuykendall, individually and d/b/a Kuykendall & Kuykendall, a partnership; Oran Moody, Jr. and Michael O. Moody, individually and d/b/a Moody & Moody, a partnership; Arthur Young & Company; Harry C. Erwin; Billy Joe Cabaniss, Jr.; Joseph F. Drozal, Jr.; Charles M. Hanson; Hal Brewer; Waldo Price; Truman O. Boatright; J.O. McClure; Hugh Winfrey, Jr.; M.V. Creech; Charles Bane; E.H. Pritchett, Jr.; Robert Plunkett; Ralph McClure; Jimmy Don Gooch; Jerry Metzger; W.J. Rimmer; Don Sebo; Joe Wayne Harris; James Willis; Dan Ray Core; Harold Davis; Jay Freeman; Jay Neal, Jr.; George Wagnon; Raymond (Jack) Clark; Carl Creekmore and Morril H. Harriman, Jr., individually and d/b/a Creekmore & Harriman, a partnership; E.J. Ball, Kenneth R. Mourton, and Stephen E. Adams, individually and d/b/a Ball, Mourton & Adams, a partnership; Kirit Goradia; Eddie Joe Smith; and John Does 1–20, Defendants.

Nos. 85–2044, 85–2096, 85–2155 and 85–2259.

United States District Court, W.D. Arkansas, Fort Smith Division.

April 4, 1986.

See also, D.C., 635 F.Supp. 851.

Gary M. Elden, Daniel A. Edelman, John R. McCambridge, Kevin J. Waite, Reuben & Proctor, Christopher J. Doherty, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff, Thomas E. Robertson, Jr., As Trustee of the Farmer's Co-op of Arkansas and Oklahoma.

Robert R. Cloar, Fort Smith, Ark., for intervening plaintiffs: Bob Reves, Frances Graham, Robert H. Gibbs, as Natural Guardian of His Minor Children, Thomas A. Gibbs and Robert H. Gibbs, Jr., and Robert H. Gibbs, as Trustee of the Muskogee In-

ternal Medicine Group Profit Sharing Funds, and Bob Reves, Frances Graham, and Robert H. Gibbs as Class and Subclass Representatives.

Carl Liggio, John Matson, New York City, for Arthur Young & Co., Harry C. Erwin, Billy Joe Cabaniss, Jr., Joseph F. Drozal, Jr., Charles M. Hanson.

James M. Roy, Jr., Roy, Mashburn & Lambert, Springdale, Ark., for Arthur Young & Co.

Fred H. Harrison, University of Arkansas, Little Rock, Ark., for W.J. Rimmer.

Fines F. Batchelor, Jr., Van Buren, Ark., for Truman O. Boatright, Hugh Winfrey, Jr., Jimmy Don Gooch, Ralph McClure, Joe Wayne Harris, James Willis, Dan Ray Core, Harold Davis, Jay Freeman.

Mr. Carl Creekmore, Mr. Morril H. Harriman, Jr., Van Buren, Ark., for Carl Creekmore and Morril H. Harriman, Jr., Ind. and d/b/a Creekmore & Harriman, a partnership.

Jerry Lee Canfield, Daily, West, Core, Coffman & Canfield, Fort Smith, Ark., for Citizens Bank & Trust Co.

Robert L. Jones, III, Jones, Gilbreath & Jones, Fort Smith, Ark., for Gene Kuykendall and Fred Kuykendall, Ind. and d/b/a Kuykendall & Kuykendall, a partnership.

Thomas B. Pryor, Pryor, Robinson and Barry, Fort Smith, Ark., for Oran Moody, Jr. and Michael O. Moody, Ind. and d/b/a Moody and Moody, a partnership.

Eddie N. Christian, Christian & Beland, Fort Smith, Ark., for Jack E. White, J.E.W., Inc., Valley Feeds, Inc.

Jim Jones, Sallisaw, Okl., for M.V. Creech, Charles Bane, Jerry Metzger.

Jerry D. Pruitt, Pruitt & Hodnett, Fort Smith, Ark., for Hal Brewer, Don Sebo, E.H. Pritchett, Jr.

Kenneth R. Mourton, Ball, Mourton and Adams, Fayetteville, Ark., for Ball, Mourton & Adams, a partnership.

Mark A. Grober, Sandlin, Payne & Grober, Muskogee, Okl., for Robert Plunkett.

S. Walton Maurras, Harper, Young, Smith & Maurras, Fort Smith, Ark., for George Wagnon, Raymond (Jack) Clark, Eddie Joe Smith, Waldo Price, J.O. McClure.

Ronald D. Harrison, Harrison and Hewett, Fort Smith, Ark., for Kirit Goradia.

James B. Blair, Springdale, Ark., for E.J. Ball, Kenneth R. Mourton and Stephen E. Adams, Ind. and d/b/a Ball, Mourton & Adams.

James A. Arnold, II, Shaw, Ledbetter, Hornberger, Cogbill & Arnold, Fort Smith, Ark., for Jay Neal, Jr.

Gary D. Corum, Wilson, Engstrom, Corum & Dudley, Little Rock, Ark., for Harry Erwin.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Defendants have filed numerous objections to Magistrate Ned A. Stewart, Jr.'s Proposed Findings and Recommendations denying their motions challenging the sufficiency of the plaintiffs' consolidated complaint, under Federal Rules of Civil Procedure (FRCP) Rule 12(b)(6). These objections are before this court pursuant to 28 U.S.C. Sec. 636(b)(1).

Plaintiffs in this action are Thomas Robertson, Jr., Trustee in bankruptcy for the Farmer's Co-op of Arkansas and Oklahoma, Inc., and Bob Reves, *et al*, a class of plaintiffs composed of Co-op members, distributees of unpaid Co-op patronage dividends and holders of Co-op demand notes.

There are 36 defendants, plus 1–20 "John Does", and, cumulatively, their motions cover the field, touching all 16 causes of action, whether asserted by the Trustee or by the class. The court has determined to address these questions collectively, and to address only those motions which question whether the complaint states a cause of action. Questions of limitations, etc., will be reserved for summary judgment should the parties wish to raise them.

## A. PRELIMINARY DISCUSSION

Motions under rule 12(b)(6) of the Rules of Civil Procedure must accept all facts stated by the plaintiff to be true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). The court notes this elementary point for two reasons. First, in many cases, defendants' motions took extended issue with the truth of statements in the plaintiffs' complaint. In olden days, 12(b)(6) motions were called demurrers. A demurrer which took issue with matters raised by the complaint, or which sought to enlarge the complaint by pleading additional facts, was called a "speaking demurrer". It was customary for courts to deny such pleadings because they spake. In this case, if defendants' demurrers could talk, what tales they would tell! Defendants have invited the court to peruse argumentative exhibits consisting of publications from accounting societies, affidavits from parties, depositions, interrogatories, resumes, job descriptions, statements of witnesses, and you name it. Plaintiffs have filed responses including exhibits ranging from Business Week opinion pieces, affidavits from eminent accountants, letters from their clients, legal bills, newspaper articles about Capitol Hill doings, etc. As a consequence, the file of motions, briefs, and exhibits is some two feet thick. The primary reason, therefore, for stating such an elementary point at the head of this opinion is to express some measure of the court's irritation at the flouting of Rules of Civil Procedure by counsel on both sides in this case.

In addition, the court perceives that in this case a large percentage of parties on both sides are said to be relatively unsophisticated litigants, at least in the sense that they probably have had few contacts with the civil court system. The court desires that all parties reading this opinion be aware that in making a recital of the allegations of the plaintiffs' complaint, the court in no way indicates a belief in the statements, it rather *assumes* their truth for purposes of argument.

*Conley v. Gibson* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) established the standard this court must use in determining the validity of plaintiffs' claims, upon a defendant's Rule 12(b)(6) motion: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." This standard is, of course, quite liberal. The court is obliged to construe the complaint so as to do substantial justice. FRCP Rule 8(f). The purpose of pleading is to facilitate a proper decision on the merits. *Maty v. Grasselli Chemical Co.,* 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745 (1938). The Rules exist to "secure the just, speedy, and inexpensive determination of every action." FRCP, Rule 1. These are preliminary observations to a discussion to be undertaken later with respect to the sufficiency of the plaintiffs' fraud complaints. A too-strict, fine-toothed combapproach to the plaintiffs' complaint leads only to prolixity and delay. The court is not inclined to dismiss a complaint on pleading points. However, where the court is of the opinion that the complaint does not and cannot state a cause of action under state or federal law, then there is no point in passing the matter into discovery. As the saying goes, you should never try to teach a pig to sing: it can't be done, and it annoys the pig. This opinion will therefore only concern itself with whether the various counts can possibly state causes of action against the defendants under *any* view of the complaint.

In addition to motions brought under FRCP Rule 12(b)(6), several defendants have raised serious limitations issues. To the extent that the complaint obviously sets forth matter beyond the relevant period of limitations, the court feels that the plaintiff *should* have pleaded acts or circumstances which take the matter past the bar by limitations. *Stewart Coach Indus. Inc. v. Moore,* 512 F.Supp. 879 (D.Ohio, 1981). Because this was not done, the

court prefers to take these questions up on summary judgment. Local Rule 29 requires summary judgment movants to append to their motion statements of facts not disputed. The court feels that a Rule 56 motion filed conformably with local rules will best determine questions of limitations as justly, speedily and efficiently as possible. Similarly, certain "honorary" directors question their place in the lawsuit. The court is sympathetic to their argument. The complaint, however, states that they are directors, and for present purposes the court is inclined to keep them in the lawsuit until such occasion as the question can be reduced to agreed statements of fact, as *per* summary judgment. With these reservations in mind, the court will proceed to redact the plaintiffs' complaint in narrative form as background for discussing the causes of action expressed in the consolidated complaint.

### B. PROCEDURAL BACKGROUND AND NARRATIVE SUMMARY OF PLAINTIFF'S COMPLAINT

On February 23, 1984, the Farmer's Co-op of Arkansas and Oklahoma, Inc., filed for bankruptcy under Chapter XI of the bankruptcy code. Nearly a year later, the Trustee filed an action on behalf of the Co-op, its members, and demand noteholders, charging individual managerial employees of the Co-op, all of the Co-op's professional advisers (*i.e.*, accountants and lawyers,) and all of the Co-op's directors during the 1974–84 period. The suit charged defendants with fraud, negligence, recklessness, contract, securities, and R.I.C.O. violations, *inter alia*, and sought restitutionary, compensatory, statutory, and punitive damages. The defendants promptly moved the court for an order dismissing the Trustee's claims on behalf of the members and demand note holders, alleging that he lacked standing to assert such claims. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). Bob Reves and other members and demand note holders filed a petition to intervene, and sought permission to assert a class action against the defendants named in the trustee's complaint. The complaints of the trustee and of the intervening class were consolidated. The District Court, on September 27, 1985, approved the recommendations of the magistrate and certified the class.

In 1952, the Co-op named Jack White its general manager. One gathers that it was not a large business at the time, but that it grew to considerable size under his management—becoming one of the largest businesses in Crawford and Sebastian Counties, Arkansas. It occupies a large commercial facility in Van Buren near the Arkansas River, and operates extensive interests throughout western Arkansas and eastern Oklahoma.

Jack White served as general manager of the Co-op until 1983. His tenure was cut short by a federal indictment and conviction for tax fraud. The grand jury in Fort Smith indicted White and the Co-op's long time auditor, Gene Kuykendall, in September, 1980. The indictment alleged that for a period of time in the mid-1970's, White engaged in a pattern of self-dealing with the Co-op, and that Kuykendall concealed his predations by juggling the books. The petit jury convicted White and Kuykendall on all counts in January, 1981. White and Kuykendall remained free on bond pending their appeal. The conviction was affirmed by the Eighth Circuit in February, 1982.

White remained as general manager of the Co-op throughout this period until he surrendered himself for a six months' term of imprisonment. The plaintiffs' complaint alleges that he still retained effective control of the Co-op even while in jail (Par. 139). Kuykendall had audited the Co-op's books until 1977, when the Fort Smith firm of Moody and Moody assumed those duties. Kuykendall remained associated with enterprises owned or managed by White, specifically a corporation known as White Flame, Inc., whose misfortunes form the core of both the trustee's and the class' causes of action. All through the period preceding the Co-op's bankruptcy, the complaint states that Jack White dominated the

Co-op board, and was able to perpetrate frauds upon the Co-op either through deceit practiced upon the board or through the active collusion of board members, some of whom were business associates of White's, and some of whom received low or no-interest loans from the Co-op for investment opportunities in non-agricultural enterprises (Par. 133, 146).

The board appeared to have the highest confidence in Jack White. Subsequent to his indictment they voted to pay the legal fees and expenses incurred by White and Kuykendall and spent over $300,000.00 doing so in a losing effort. Undaunted, even after conviction, members of the board approached local news and television media claiming that White's offense was at most a technical violation of the tax laws and that no transactions detrimental to the Co-op had been shown (Par. 81). White was permitted to remain as general manager and fiduciary of the Co-op after conviction and was even given a six-month "leave of absence" to serve his sentence. (Par. 139).

Two years before the conviction, White and Edwin Dooley were involved in an enterprise called Big D & W Refining and Solvents, Inc. Each owned half the shares. Dooley was President and White was secretary of the corporation. (This company later changed its name to White Flame Fuels, Inc., and for sake of consistency, will be referred to as White Flame throughout this opinion.) White Flame decided to build a plant to produce gasohol, and began building the facility in June, 1979 (Par. 25). A few months later, White bought Dooley's shares and agreed to hold Dooley harmless for the $1.2 million they had borrowed to finance the plant. The White Flame balance sheet for 1979 was then prepared by Kuykendall, and showed a net worth of $350,000, attained by carrying the gasohol equipment and plant at their purported cost of $1.5 million. White Flame was insolvent at the time (Par. 27). Apparently, the plant and equipment were poorly designed and grossly inefficient.

White experienced great difficulty attracting capital to continue operating White Flame. Conventional lenders wouldn't touch it. The Farmers Home Administration advised him that the plant would have to produce at 90% capacity for sixty days before it would be eligible for financing. The best the plant could produce was 25% capacity. White continually solicited FmHA financing from January, 1980, until October, when he learned that his application would no longer be considered. In the meantime, White induced the Co-op to lend White Flame money to operate its plant, and gave the Co-op his guaranty for low-interest, unsecured loans eventually amounting to $3.8 million. The plaintiffs charge that these loans were either completely unauthorized or were made by deceiving the board (Par. 33).

By the end of 1980, therefore, Jack White was in financial straits because of White Flame. Because he had guaranteed White Flame's debt to the Co-op, he stood to lose his entire personal fortune if the Co-op called in the loans. The complaint alleges that certain defendants conceived a plan to have the Co-op buy White Flame from White in return for a release of his nearly $4 million in personal obligations to the Co-op.

At the December 11, 1980, board meeting, the Co-op's general counsel, Carl Creekmore, announced his resignation. The following day, Creekmore filed a lawsuit for the Co-op against White. The complaint in the lawsuit was prepared by White's counsel in the criminal tax fraud case, Ball and Mourton, of Fayetteville, Arkansas. Ball and Mourton had been tax counsel to the Co-op since 1974. They had represented the Co-op in tax deficiency proceedings stemming out of the IRS investigations which culminated in the indictment of White and Kuykendall. Perhaps as a result of that association, they became White's personal counsel in the criminal case. The complaint alleges that Ball and Mourton unethically represented the interests of both the criminal (White) and his victim (the Co-op) and ignored their fiduciary duties to the Co-op.

Shortly after Creekmore filed the complaint, Ball and Mourton mailed Creekmore White's answer and a proposed consent decree. Creekmore filed the answer and secured the chancellor's approval of the decree. The effect of the decree was to transfer White Flame to the Co-op and to release White from his guaranty on the $4 million in loans and interest owed to it. The complaint states that certain documents were altered to make it appear as though the Co-op had bought White Flame ten months earlier, in February, 1980 (Par. 43).

As a proximate result of this transaction, the Co-op relinquished an asset purportedly worth $4 million (White's guaranty) for assets worth only $500,000. These assets required further investment to become productive, and the Co-op spent $1.8 million for that purpose. The acquisition of White Flame pushed the Co-op to the point of insolvency, and disabled it from continuing in business unless it misstated the value of the White Flame assets. (Par. 44).

During this time Oren Moody, of the firm of Moody & Moody, CPAs, served as the Co-op's independent auditor. He undertook to audit the Co-op's books as of December 31, 1980, and presented his report to the Co-op board in March, 1981, after White and Kuykendall had been convicted of self-dealing and "cooking the books" in the federal criminal tax trial. The plaintiffs state that Moody's report was negligently and fraudulently misleading to the Co-op and investors, principally existing and future holders of the Co-op demand notes. Particularly, they allege that Moody reported the $4.1 million receivable from White Flame to the Co-op at full value when he had no reason to believe it was collectable; that he failed to report White Flame's $1 million loss for 1980 on the Co-op's income statement, thereby allowing the Co-op to show a profit when it had in fact lost substantial sums; and that Moody failed to "go behind" White Flame's 1980 audit, which was fraudulently prepared by Kuykendall, thereby rendering his own opinion an instrument of fraud against the Co-op, its members and investors.

Plaintiffs charge that Kuykendall's audit of White Flame, (which was incorporated into the Co-op audit,) falsely reported the net worth of White Flame's assets as $4 million when they should have evaluated them at $500,000. The plaintiffs also claim that Kuykendall fraudulently reported that White Flame had lost only $80,000 during the first year, when in truth it had lost over a million dollars. These fraudulent audit findings were reported as true in the Moody audit, and materially misled Co-op members and investors, due either to Moody's negligence or fraudulent connivance.

The plaintiffs further allege that the Moody audit misled members and investors by reporting only 20% of the outstanding Co-op demand notes as current liabilities. The demand note program started in 1959. The Co-op solicited individuals to invest money, and in return the Co-op would give them promissory notes, payable on demand, carrying an interest rate higher than that available from local banks and savings institutions. The higher interest made the opportunity attractive to investors; the lack of F.D.I.C.–type insurance made it perhaps less attractive. One gathers from the complaint that individuals would invest in such a program only if the enterprise looked safe from a business standpoint. In this connection, financial reports and audits were important influences in an individual's decision to invest his money in Co-op notes. One infers that an accurate accounting of current assets and liabilities would be important, since the Co-op's ability to promptly retire current liabilities depended on the depth of its current assets. Reporting the demand notes as 80% long-term liabilities painted a roseate picture of the Co-op's ability to absorb a "run" by investors in its savings program.

Until 1964, the Co-op had, in fact, reported the demand notes as 100% current liabilities. Beginning in 1965, however, Co-op statements accounted the notes as one-third current, two-thirds long term. In 1973, this was changed to one-fifth. White

and Kuykendall initiated this misstatement, and in 1977, when Moody became auditor, he continued it. When Arthur Young & Co. became auditor in 1981, it corrected the misstatement and began reporting the demand notes as 100% current liabilities again. But for the 1980 audit, Moody reported the Co-op's current liabilities at $11 million against current assets of $13 million. The complaint suggests that a true picture would have shown the Co-op backing up to $18 million in current liabilities with $13 million in current assets.

Arthur Young took over the Co-op's audit for the year ending December 31, 1981. The plaintiff trustee and investors claim that Arthur Young materially misled the Co-op and its members/noteholders by inflating the value of gasohol assets owned by White Flame. The books reported those assets at a value exceeding $3 million, whereas in fact they were worth less than $500,000. Arthur Young's performance is termed negligent or fraudulent for not getting an appraisal of White Flame's properties. Instead, they arbitrarily decided to treat the gasohol plant as having been owned by the Co-op from the start of construction even though they knew that this was not the case (Par. 60). The plaintiff alleges that Arthur Young considered requiring the Co-op to write the White Flame assets down to their net realizable value, and in the absence of compliance, to issue an adverse opinion. Arthur Young's auditors are charged with knowing that White and Kuykendall had deliberately cooked White Flame's books to make it appear that items properly chargeable to expense were added to the capital asset account. For these reasons and others, the plaintiffs allege negligence, gross negligence and fraud against Arthur Young.

Arthur Young gave the Co-op an unqualified opinion in 1981 and 1982, and presented the same to the Co-op's annual meetings in March 1982, and 1983. The actual opinions footnoted a reservation that there was "some doubt as to the recoverability of the Co-op's investment in White Flame", an investment which, by the time of the March, 1983, meeting, had grown to over $7 million. The Co-op, with the knowledge and participation of Arthur Young, issued a "condensed" version of its financial reports to its members and noteholders. The "condensed" reports, which were known to Arthur Young and the management clique of the Co-op to be materially misleading, contained no reservations concerning the recoverability of the White Flame investment. Management circulated a report to the members and to the public that the Co-op was financially sound throughout 1981 and 1982, when it was in fact insolvent.

For some time, the Arkansas Securities Department had been concerned about the Co-op's demand note investment program. As early as the mid-70's, it had written the Co-op and demanded that the notes be registered as securities. In March, 1974, the department demanded that White disseminate accurate financial information to current and prospective members and investors. White misled the department, saying that the Co-op did so, when in fact the reports it circulated were condensed reports such as Moody's, which in themselves were misleading because they contained no explanatory notes.

In May of 1983, the Securities Department demanded that the Co-op cease accepting further investments in demand notes until appropriate disclosures were made. Attorney Morril Harriman counseled the Co-op's general manager (then Fred Howard) to sign an agreement to comply, and then counseled him to ignore the agreement and to accept notes. It is alleged that, if access to demand note capital had been denied the Co-op, it would have folded then and there. Harriman represented to the Securities Department that the Co-op was solvent, when, in fact, it was not.

In October, 1983, the department permitted the Co-op to issue demand notes and "re-investment certificates" on the condition that persons be issued an offering statement at the time of initial investment or monthly reinvestment of interest. The

new general manager, Eddie Joe Smith, knowingly permitted members and investors to invest and reinvest their money in the Co-op without showing them the offering statement. Had he shown them the offering statement (which was so worded as to make it unlikely that any person would choose to invest), the disclosure would have caused a run on the Co-op which it could not have absorbed.

A few months later, the Co-op declared itself bankrupt and entered re-organization proceedings.

The defendants in this action, thirty-six by present count, array themselves into three basic groups. The first group may be termed the management group, and consists of Jack White, Gene Kuykendall, Comptroller Kirit Goradia, General Manager Eddie Joe Smith, as well as enterprises owned or controlled by White, such as J.E.W., Inc., White Flame Fuels, Inc., and Valley Feeds. Basically speaking, members of this group are said to have directly assisted White in looting assets of the Co-op by fraudulently making book entries and concealing White's self-dealing. In this connection, the complaint speaks of Kuykendall and Goradia primarily. White's three corporations are alleged to have looted Co-op assets. Eddie Joe Smith is alleged to have conspired with White (Par. 15) and to have fraudulently prolonged the life of the Co-op for the purpose of attracting investments in the demand note program, despite a knowledge of the Co-op's insolvency, and the certain failure of any investment made in it.

The second group of defendants may be referred to as the professional group, and consists of accountants with Moody & Moody, and Arthur Young and Co. A number of attorneys are also included among this group, specifically E.J. Ball and Ken Mourton, and through them the firm of Ball, Mourton & Adams, and Carl Creekmore and Morril Harriman, and through them, Creekmore and Harriman. All are said to have conspired with Jack White, except perhaps Steven Adams, who practices with Ball & Mourton. (Par. 15).

The third group consists of the Co-op directors. These number twenty-one parties, two of whom are dead. The complaint suggests that some directors were culpable of fraud and directly connived with White; and that the remainder were negligent, grossly negligent and reckless in their stewardship.

## C. PLAINTIFFS' CAUSES OF ACTION

### COUNT I: RETURN OF PROFESSIONAL FEES PAID TO LAWYERS' ACCOUNTANTS

Count I seeks return of legal fees and expert witness fees incurred in the defense of White and Kuykendall, paid by the Co-op to the firm of Ball and Mourton, attorneys at law, and Arthur Young & Co., CPA's. On September 4, 1980, the federal grand jury indicted Jack White and Gene Kuykendall. The gist of the indictment was that the Co-op's tax return had been falsified by mislabelling certain payments to and from the Co-op as patronage income and dividends. The indictment charged that White engaged in a course of self-dealing with the Co-op, and that White and Kuykendall had conspired to conceal from the IRS the true nature of White's transactions with the Co-op. Specifically, the government charged that by manipulating the books and records of the Co-op, White and Kuykendall masked the true nature of an Industrial Development Bond issue, and disguised payments of taxable compensation to White as tax-exempt interest.

On September 8, 1980, the Co-op's Board of Directors met and unanimously passed a resolution expressing its confidence in White and Kuykendall. Later, on December 11, 1980, the Co-op board, in a regular meeting, voted to pay White's and Kuykendall's legal expenses. The criminal trial commenced January 5, 1981, and the jury returned a verdict of guilty on January 23. The defendants appealed their convictions to the court of appeals, which heard arguments on December 11, 1981, and dismissed the appeal on February 26, 1982. The opinion of the Eighth Circuit stated: "The

record clearly demonstrates that White and Kuykendall manipulated the Co-op's finances to serve their own personal ends, and that they distorted the Co-op's records of receipts subject to corporate income tax." *United States v. White*, 671 F.2d 1126, 1134 (8th Cir.1982). The opinion relates, *inter alia*, that the Co-op paid interest to White in the amount of $149,600 in 1975 and 1976, and incurred a $50,000 fee to underwriters, as a result of a transaction in which the Co-op lent White $1,500,000, interest-free, in order to buy an equivalent amount of its bonds to finance construction of new facilities.

Plaintiffs charge that it was wrong for Ball and Mourton, the defense attorneys, to take legal fees from the Co-op because the firm also represented the Co-op on tax matters, and therefore owed it a fiduciary duty to protect its interests. The complaint charges that Ball and Mourton knew or should have discovered that White and Kuykendall had impermissibly acquired Co-op assets, that defendants' course of conduct was self-interested, and that the Co-op, as victim of their predations, should not be expected to fund the defense of the wrongdoers. The White and Kuykendall defense team hired accountants with Russell Brown & Co. (later Arthur Young) to give expert testimony for the defense during the criminal trial. The Arthur Young accountants are charged with knowledge of White's and Kuykendall's self-dealing activities, making their receipt of fees from the Co-op wrongful.

In sum, the attorneys and accountants are charged with knowing that White's and Kuykendall's activities in no way benefited the Co-op, and were not intended to, and that such actions could not constitute, on the part of White and Kuykendall, a good faith discharge of their duties to the corporate entity. The complaint in Count I charges that White and Kuykendall unlawfully obtained $300,000 of Co-op funds for their defense. The complaint seeks actual and punitive damages for the Co-op and the class from White and Kuykendall on the theory that the expense of defense was personal to them and not one properly payable by the Co-op; from defendants Creekmore and Harriman, the Co-op's general counsel, on the theory that they should have advised the Board not to approve this outlay, such failure being negligent or fraudulent; from the directors, on the theory that they negligently or fraudulently approved the disbursement of Co-op funds; and from the defense attorneys and accountants, on the theory that they were *particeps* in the receipt of Co-op funds on behalf of White and Kuykendall, and thereby breached their own personal fiduciary duties (at least in the case of Ball & Mourton), or assisted White in violating his own fiduciary responsibilities.

 The lawsuit purports to seek recovery under this court on behalf of both the Co-op and class. At least insofar as this count is pressed by the class, it must be dismissed for lack of standing. The right of action against officers and directors to redress wrongs to the corporation resides in the corporation and, except as statutes might otherwise provide, the right is the exclusive property of the corporation. *Red Bud Realty Co. v. South*, 153 Ark. 380, 396, 241 S.W. 21 (1922). A wrong done to a corporation is one done to the entity and not to the shareholders distributively. *Jones v. Foster*, 70 F.2d 200, 205 (4th Cir.1934), *cert. denied*, 293 U.S. 558, 55 S.Ct. 70, 79 L.Ed. 659 (1935). Stockholders may bring derivative suits, of course, but such suits are equitable in nature even if premised on legal grounds. *Taylor v. Terry*, 279 Ark. 97, 649 S.W.2d 392 (1983). As vehicles of equity, punitive damages are not available. Jury trials, also, are not available in equity for the claims of shareholders. To include class claims in this count will entail only confusion. Generally, therefore, where the corporate entity has already sued, and there is no claim that the interest of the shareholders was not adequately represented by the corporation, it is error to allow a separate action brought by shareholders to proceed. *See, e.g., Vanderboom v. Sexton*, 460 F.2d 362 (8th Cir. 1972).

The class argues that Arkansas departs from the rule disallowing shareholders to sue in their own name for damages suffered by the corporation, *citing, inter alia, Henderson v. Rounds and Porter Lumber Co.*, 99 F.Supp. 376 (W.D.Ark.1951); *In re Ozark Restaurant Supply Co., Inc.*, 41 B.R. 476 (Bankr., W.D.Ark.1984); *Sternberg v. Blaine*, 179 Ark. 448, 17 S.W.2d 286 (1929); *Bank of Commerce v. Goolsby*, 129 Ark. 416, 196 S.W. 803 (1917); and *Bank of Des Arc v. Moody*, 110 Ark. 39, 161 S.W. 134 (1913). These cases are distinguishable. *Henderson* and *Ozark Restaurant* were creditors' actions against parties who had abused the corporate form to defraud trade creditors. Both cases deal with controlled or subsidiary organizations which were forced to sell their wares to the parent at artificially low prices, by which practice the subsidiary became insolvent. The induced insolvency worked a fraud on those suppliers who extended credit to the subsidiary. In *Henderson* the creditor himself, and in *Ozark Restaurant*, the bankruptcy Trustee, were permitted to undo the frauds perpetrated through the subsidiary. These authorities do not overrule *Red Bud Realty v. South, supra*. They are distinguishable. They do not suggest that a shareholder in a corporation may directly sue third parties who supply defective goods or services to the corporation. Such a holding would introduce chaos and mischief. Suppliers of defective goods and services could conspire to have owners of a single share file actions against them in equity court to avoid juries and penalties.

The remaining three authorities cited by plaintiffs, *Sternberg v. Blaine, Bank of Commerce v. Goolsby*, and *Bank of Des Arc v. Moody, supra*, are bank failure cases from early in the century which held that bank directors were liable to shareholders and depositors for negligent supervision ending in insolvency. None of them concerned a matter such as the one here in suit; that is, a shareholder's personal right to sue a third party who allegedly owes a corporation some money or who provided faulty goods or services to the entity. The court is convinced that such an action by a shareholder is purely derivative. As a derivative action, it cannot proceed where the corporation or its trustee have already filed the claim. The class's cause of action under Count I is hereby dismissed.

In further support of its decision, the court notes that in 1965, the Arkansas General Assembly passed the Model Business Corporation Act. The state's organic corporation law, to the extent that it once might have allowed shareholders to sue third parties, now provides that such actions proceed as derivative suits. Ark.Stat. Ann. Sec. 64–223 (1980 Repl.). While there may be shareholder actions which are personal in nature, rather than derivative, such is not the case in this instance. As Henn, *Law of Corporations*, 2d Ed H.B., Sec. 360 at 757 (1970) says:

"No simple and foolproof method exists whereby a derivative action may be distinguished from a shareholder's direct or individual action. But generally speaking, the breach of the shareholder's membership contract gives rise to a direct or individual action while a wrong to the incorporated group as a whole (*i.e.*, breach of some duty to the corporation) is the basis for a derivative action."

If the cause of action expressed in this count belongs to anyone, it belongs to the trustee. Defendants attack the trustee's complaint on the grounds that it states no cause of action, and that even if, *arguendo*, a claim is stated, it is barred by the three year statute of limitations for fraud. Without going into detail, the court is convinced that defendants' arguments are meritless.

There is little doubt that a corporation may pay attorney's fees for the criminal defense of directors and officers. When the corporation agrees to pay those fees in advance, the law requires the officer or director so benefitted to agree to pay the money back in the event that his actions were not found to have been in good faith. Ark.Stat.Ann. Sec. 64–309(E). It does not appear that this was done. Given the tenor of the Eighth Circuit's opinion that White's and Kuykendall's acts were directed to-

wards "personal ends," *United States v. White,* 671 F.2d at 1134, a reasonable director would have concluded that repayment by the defendants was in order. That this course was not pursued gives the trustee the right to proceed against the directors under Arkansas law. Furthermore, the third parties involved in this case knew or should have known, under the pleadings, that they were accepting money from the Co-op, to defend Co-op fiduciaries, for acts which, if proven, constituted a serious breach of fiduciary duties. In *Raines v. Toney,* 228 Ark. 1170, 313 S.W.2d 802 (1958), the court held that persons who assist a fiduciary in the breach of his obligations are liable to the persons or entities so damaged.

■ The limitations arguments of the defendant lawyers and accountants have been noted, but are not now decided since the question when the limitations period actually began to run against the Co-op may be one for the jury, in the absence of undisputed facts. *See, e.g., Vanderbloom v. Sexton,* 460 F.2d 362, 364 (8th Cir.1972) (semble). If facts are undisputed, as well as inferences to be drawn therefrom, we may take this up in summary judgment form.

Defendants' motions to dismiss the trustee's claim are hereby overruled.

## COUNT II: FRAUD AND VIOLATIONS OF FIDUCIARY DUTY RELATING TO THE GASOHOL PLANT

Plaintiffs' second cause of action attacks the transaction by which White Flame Fuels was transferred to the Co-op. The complaint charges Jack White and his related enterprises with fraud, and also states claims against Kuykendall and his partners, the Co-op's directors, Ball and Mourton, Goradia, Creekmore and Harriman. As previously related, the complaint charges that White Flame, whose asset values were inflated eight-fold by Kuykendall, was passed to the Co-op in return for the cancellation of $4 million of indebtedness owed by it and White. The complaint includes an allegation that attorneys and

White, along with attorneys Carl Creekmore, and the firm of Ball & Mourton, conspired to commit a fraud on the Crawford County Chancery Court as an element of their plan. As a result of these actions the complaint seeks damages "for all losses sustained by the Co-op". (Consolidated Complaint, Count II, p. 23).

For reasons discussed in the court's opinion with respect to the class's standing to bring a complaint against third parties, *supra,* the court dismisses that part of Count II which seeks damages for the class.

Defendants vigorously argue that the entire complaint charging fraud in Count II should be dismissed for failure to plead reliance and for failure to plead specific facts under Rule 9(b). The court conceives this as a very considerable grievance for certain defendants, who claim not to know what they are charged to have misrepresented, and which persons, if any, relied to their detriment upon statements made by them.

It is a matter of some debate in the courts whether Rule 9(b), which requires that fraud be specifically pleaded, is relaxed by Rule 8, which demands that only a short statement of the claim be required: or whether detailed narrative pleadings are required in fraud cases notwithstanding the notice pleading ordinarily required under Federal Rules. In a wide-spread case of alleged fraud, such as this one, spanning five years and involving thousands of parties, as many as 57 of whom are defendants, a specifically pleaded complaint could run into the hundreds and hundreds of pages. There have been any number of pained remarks by defense counsel concerning the length of this "abbreviated" complaint, so as to persuade the court that, if the plaintiffs had chosen to plead with that specificity demanded by the defendants, the court should now be having to pass on motions to strike. *E.g. Iafrate v. Compagnie Generale Transatlantique,* 12 FRD 71 (S.D.N.Y.1951).

■ The court therefore feels that a balance needs to be struck in fraud cases of

this kind. The court believes that to the extent that a fraud complaint identifies with a fair amount of particularity the transactions being questioned, the dates upon which they occurred, and the principal actors involved, the pleadings should pass muster. The court has little difficulty following the thread of plaintiffs' complaints. If it were required to put itself in the position of a party summoned to defend this action, the court believes that it would be able to identify the relevant issues and prepare an apt answer and defense. To require much more would be wasteful, and, as this case proves, dilatory.

■ It is probably not even advisable that a fraud plaintiff plead with greater particularity than was done here. Plaintiffs have the heavy burden of proving fraud by clear and convincing evidence. *Bradley v. Southern Farm Bureau Casualty Co.*, 392 F.Supp. 478 (E.D.Ark.1975). In Arkansas, that standard is deemed satisfied when the proponent produces "... evidence by a credible witness whose memory of facts about which he testifies is distinct and whose narration of details thereof is exact and in due order and whose testimony is so clear, direct, weighty, and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the facts related ..." *Kelly v. Kelly*, 264 Ark. 865, 575 S.W.2d 672 (1979).

A defendant's credibility is critical in an action based on fraud. If the plaintiff were required to disclose in his first pleading every circumstance grounding his belief that he has been defrauded, a wrongdoer would be apprised of the identity of plaintiff's sources and the extent to which he has secured documentation for his belief. Such a wrongdoer would be given an opportunity in advance of oral discovery to begin fashioning testimony to explain apparent contradictions. Counsel experienced in fraud litigation well know the vital importance of committing defendants to completely impeachable accounts of their actions and motives. If the defendant is completely informed of the materials in his opponent's possession, the best efforts of counsel to ensnare him in a web of his own deceits will be for naught.

In saying this, the court does not presume that any fraud has been practiced by any of these defendants. It bears notice, however, that the innocent fraud defendant stands to gain nothing more than a general litigation advantage from a requirement that the plaintiff detail every circumstance giving rise to his belief that he has been defrauded. The truly injured plaintiff, on the other hand, stands to forfeit whatever chance of success he holds against the heavy odds laid down by the clear and convincing standard of proof in his case. Pleading rules should not be read to demand a level of particularity that only makes a complaint prolix, at great cost to the plaintiff, and with no special benefit running toward the honest defendant, whom Rule 9(f) is designed to aid.

■ For the reasons indicated above, the court believes that the complaint sufficiently alleges both fraud and reliance (Consolidated Complaint, Para. 68). The court would note plaintiffs' suggestion that reliance may be presumed in cases such as this one. This may well be the law in other jurisdictions. *Zatkin v. Primuth*, 551 F.Supp. 39 (S.D.Cal.1982). But in Arkansas, fraud is never presumed. *Donovan Construction Co. v. Woolsey*, 358 F.Supp. 375 (W.D.Ark.1973). Whether reliance *as an element* of fraud may be presumed as plaintiffs suggest is an open question, unnecessary to be resolved since the court believes for present purposes it has been sufficiently alleged.

■ The court notes that the complaint does not, for example, specifically state that Moody's determination to treat demand note funds as long-term liabilities either induced a party to buy the notes, or persuaded him to forebear from selling them when a prudent investor would have done so were he fully advised of the facts. If an auditor owes fiduciary duties to a corporation [and the court does not now decide that they do, *but see, Investors Funding Corp. of N.Y. Sec. Lit.*, 523 F.Supp. 533, 542, n. 4 (S.D.N.Y.1980)] then

actionable fraud would exist not only as to positive deceit, but also where the fiduciary failed to disclose important facts, a situation where reliance is *inferred* rather than proved. Furthermore, reckless conduct freely substitutes as sufficient evidence of fraud in fiduciary contexts. Moody's reckless failure to inform the Co-op that the entity was nearly insolvent, and lacked sufficient current assets to retire the demand notes when "due", might very well make out a submissible case of fraud under such a theory.

The complaint is therefore dismissed as to the class and sustained as to the Co-op.

## COUNT III: SECURITIES FRAUD IN TRANSFERRING WHITE FLAME TO THE CO-OP

Count III charges White, his related enterprises, Kuykendall, Co-op directors, Ball and Mouton, Goradia, Creekmore, and Harriman with securities fraud in transferring White Flame stock to the Co-op. The complaint alleges that the transaction violated the Securities Exchange Act of 1934 and the Arkansas securities fraud statute. The complaint states a cause of action under both the federal and state law. However, inasmuch as the Co-op, and the Co-op alone was the "buyer", the complaint does not state a cause of action on behalf of the members and patronage dividend holders.

## COUNT IV: WRONGFULLY PROLONGING OPERATION OF THE CO-OP AND MISLEADING GOVERNMENT AUTHORITIES

Count IV seeks damages for the Co-op and the class against essentially all of the defendants for negligence and fraud in prolonging the existence of the Co-op after insolvency. (Para. 53, Consolidated Complaint). *See, Schacht v. Brown*, 711 F.2d 1343 (7th Cir.), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983). This count of the consolidated complaint may proceed on behalf of the Co-op and the class because even though the pleading specifies a common core of negligent/fraudulent acts, the damages sustained by the class are different from those alleged to have been suffered by the Co-op. The operation of a corporation beyond the point of its insolvency works a fraud upon creditors and investors, at least to the extent that they have been misinformed as to the true status of the corporation's affairs. The consolidated complaint (at Para. 67) alleges, for example, that the Arthur Young defendant knew that class members, largely elderly unsophisticated parties, were investing millions of dollars in the Co-op on the strength of audits by Arthur Young which had been "condensed" to a point where they failed to show that which the Arthur Young partners knew to be the case: that the company faced a "high probability of bankruptcy." Had the investors been correctly informed, they would either have refrained from transferring their savings to the uninsured Co-op, or they would have taken steps to withdraw their moneys from the corporation. As a result, the class is said to have lost the value of investments made after February 14, 1980 (Consolidated Complaint, Para. 107).

The Co-op, on the other hand, is said to have lost moneys by virtue of the fact that the artificial prolongation of its existence disabled officers, directors, and/or members from taking action to redress wrongs done to it; that it continued to incur liabilities beyond a time when it could have managed to absorb them, deepening the damages to its fisc; and that it became a helpless victim of further looting throughout its insolvency, whereas if it had been in receivership, its assets would have been saved rather than squandered. (Consolidated Complaint, Para. 106). One thinks, in this connection, of the $1.8 million spent by the Co-op to operate the defunct White Flame plant after it was officially transferred to the Co-op by White. [Consolidated Complaint, Para. 44(b)].

The plaintiffs, then, were injured *severally* by the acts of the defendants in prolonging the existence of the corporation. This is not a case where the Co-op, principally, was injured, and therefore its members and

shareholders were affected. Instead, the investors were injured by being induced to become members of the "class". Not to put too fine a point on it, the investors theoretically have a cause of action *against* the Co-op for issuing demand notes to them. The Co-op has no power to sue for damages it caused. The essential distinction between those damages sought in Counts I, II, and III, where the court has disallowed the class from proceeding, and those sought in this count, where the class may present its complaint, is that in the former instance, all damages directly affected the Co-op, and no such direct effect visited the class; whereas in the latter instance, class members have suffered damages unique to themselves, losses which the Trustee could not claim because he represents an entity *actually adverse* to the class insofar as their claim is concerned.

■ The consolidated complaint alleges that the negligence of certain accountants and lawyers damaged the class by presenting an image of financial salubrity, when in fact the Co-op was practically bankrupt if not actually insolvent. At issue, then, is the liability of professional advisers to the investing public for negligent misrepresentations presented in financial reports, audits, etc. As a general rule, an accountant is liable to persons not in privity with him only for fraudulent misrepresentations, not for negligent ones. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). This decision is somewhat of an anomaly: it was written at a time when the "citadel of privity" had been breached on nearly all sides, chiefly because of the work of Justice Cardozo, who authored the *Ultramares* "exception." This limitation on general negligence liability has survived numerous subsequent challenges, although recently third parties have enjoyed a limited measure of success. *See, e.g., Zatkin v. Primuth*, 551 F.Supp. 39 (S.D.Cal.1973); *Ingram Industries v. Nowicki*, 527 F.Supp. 683 (E.D.Ky.1981). "Academic" opinion, *viz.* Restatement 2d Torts, Sec. 552, is hostile to the *Ultramares* limitation. It is said in short that the "better" or "more pro-gressive" rule of law is to abandon the privity defense in cases where a professional has negligently advised his client, resulting in damages to third parties.

■ This court does not conceive its duty to be to apply so-called "more modern" rules of law in diversity cases; rather, it believes that it should apply the rule which Arkansas courts would most probably use to determine a conflict. First, the American Law Institute, which sponsors the Restatement 2d Torts, is a learned body, but not a governing one. It is unaccountable to the political process. There was sparse curial support for the Institute's determination that liability should attach even in the absence of privity. In fact, there was none. This court hesitates to follow the lead of plaintiffs' counsel who argue that duties be created to favor remote parties because, for example, of the "availability of insurance" to cover the risk. It seems to the court that this makeweight argument really stands the entire question on its head. The standard of behavior ultimately being enforced in such a case is a "duty to buy insurance". Given the currently and widely expressed concerns among Arkansas legislators about the availability and cost of business insurance (*see,* Arkansas Gazette, March 17, 1986, p. 3) and their growing determination to act legislatively in this very area, either by limiting the kinds of claims that might be presented or by adjusting the premiums which might be charged, this court feels that it is most inappropriate for it to be creating "new torts" at this time, and declines to pronounce liability in the absence of strong signals from our state courts that they would do so.

Second, such "strong signals" are absent in this instance. In fact, to the extent that such a case was ever presented in Arkansas, a federal court sitting in diversity determined *sub silentio* that negligence was not the appropriate standard of behavior to measure the duty of care running from an accountant to a third party relying on his audit. *Donovan Construction Co. v.*

*Woolsey,* 358 F.Supp. 375, 383 (W.D.Ark. 1973). In fact, it is a general rule of Arkansas contract law, (except in sales of goods), that consequential damages for faulty performance are strictly limited to those which necessarily flow from the breach, or which were tacitly agreed-to by the breaching party. Note, "Tacit Agreement Rule Reaffirmed in Contract Cases in Arkansas," 32 Ark.L.Rev. 139 (1978). This rule is not direct or compelling authority for the court's position on this issue. Rather, the rule obliquely supports the court's determination in this way: the contractual relationship is initially consensual, and the Arkansas courts conceive that the relationship maintains its consensual character throughout, even to the point of holding that a breaching party must be found to have "assented to such a liability" before he might be charged with consequential damages for his breach. *See, Hooks Smelting Co. v. Planters Compress Co.,* 72 Ark. 275, 286, 79 S.W. 1052, 1086 (1904). As the Arkansas Law Review note suggests, Arkansas has held to this minority position even in the face of its decline elsewhere in the country. This court would find it hard to believe that Arkansas would broaden tort liability to innumerable third parties arising out of a contractual relationship, while it retains a strict limitation *vis a vis* the extent and kind of contractual remedies available to the parties in privity.

Finally, even if the court were inclined to allow third parties relief for negligent misrepresentations, it would not do so in this case. Those jurisdictions allowing third parties relief in cases such as these have done so where small numbers of plaintiffs comprise the class. The court understands that there are upwards of 23,000 persons in the plaintiff class, several thousand of whom are holders of demand notes. This class is simply too large even for the more modern theory of liability suggested by Restatement 2d Torts Sec. 552.

 This means, in sum, that that part of the class' complaint charging negligence will be dismissed. The class may pursue its action grounded in fraud, or such gross negligence as amounts to fraud. The Co-op may ground its action in negligence or fraud, since it enjoys privity of contract with its professional advisers.

## COUNT V: BREACH OF CONTRACT BY ACCOUNTANTS

The motions to dismiss filed by all lawyers and accountants ask the court to find that Arkansas law holds that no cause of action may be maintained against them for breach of contract, where the gist of the complaint is that the defendant badly performed his contractual duties. The defendants insist that such a complaint sounds exclusively in tort.

The considerable pleading and briefing on this point impels the court to conclude that this is no mere academic point. The court suspects that plaintiffs fear that if they are forced into a cause of action sounding in negligence, they will face defenses, i.e., contributory negligence, not ordinarily available to all action on a contract. Additionally, certain facts clustering around the general rubric of fraud and deceit require the plaintiff to plead and prove that he relied on the misrepresentation. Of course, if the plaintiff has bargained and won a contractual promise that certain representations are true, then the issue of reliance falls from the case, with exceptions not relevant for this discussion.

If indeed that is an accurate statement of plaintiffs' fears (and defendants' hopes) then both may underestimate the flexibility of tort law to deal with the very special problems of negligent performance within the consensual environment of the professional relationship. Contributory negligence, for example, is commonly invoked to reduce or bar a negligent plaintiff's recovery in a traffic mishap. In the case of an audit which fails to disclose embezzlement by an employee, it is superficially appealing to suggest that the employer may be principally at fault for his losses for having failed on his own to detect the dishonesty, or in having hired an untrustworthy clerk in the first place. Yet, courts dealing with this problem have had little difficulty pen-

etrating such an argument. *See, e.g., Lincoln Grain, Inc. v. Coopers & Hykrand*, 216 Neb. 433, 345 N.W.2d 300 (1984). Interestingly, the resolution reached by *Lincoln Grain*—that the contributory negligence of the audited client is a defense only where it has contributed to the accountant's failure to perform the contract—bears strong resemblance to the contract doctrine that one is not responsible for his failure to perform if he was frustrated in doing so by the plaintiff.

This court cannot forecast what problems may arise from its decision on this question. Understandably, therefore, the court is loathe to make "outcome determinative" decisions on the basis of the pleadings. Nevertheless, if the law of Arkansas does not allow an action to proceed in contract against a lawyer or accountant charged with misfeasance in the course of his services, then this court would be remiss in not acting promptly on the motion. The estate and the defendants would squander valuable discovery time and resources on contract issues which may not properly be submissible to a jury. Given the staggering legal fees generated by this action, it is also uneconomic to invite later motions for summary judgment if, indeed, *no* set of facts can ever be developed which would permit an issue to be given to a jury under a set of instructions embodying contract theories.

Defendants claim, and indeed it appears, that the complaint recites that the accountants performed their services *badly*, not that they simply failed to perform them at all. Furthermore, the contracts between the auditors and the Co-op do not appear to contain any special engagements beyond the promise to audit the books and prepare the tax returns. By "special engagements" we are referring, for example, to a promise to perform the services within a particular time. If such a special promise were present, and such a promise were not part and parcel of a general duty to use reasonable care in the rendition of professional services, then an entirely different question would be presented concerning the applicability of tort on contract law.

*See, e.g., L.B. Laboratories, Inc. v. Mitchell*, 39 Cal.2d 56, 244 P.2d 385 (1952). Such a case does not appear on the state of the pleadings, and instead we are brought again to the question whether a professional's failure to observe a given standard of care in his services may be heard in contract.

The plaintiffs have cited five Arkansas cases for the proposition that one may sue an accountant or lawyer, in tort or contract, for the negligent performance of the duties: *Dorr v. Fike*, 177 Ark. 907, 9 S.W.2d 318 (1928); *Derby v. Blankenship*, 217 Ark. 272, 230 S.W.2d 481 (1950); *Midwest Mutual Ins. Co. v. Arkansas National Co.*, 260 Ark. 352, 538 S.W.2d 574 (1976); *Lawrence v. Francis*, 223 Ark. 584, 267 S.W.2d 306 (1954); *Rhine v. Haley*, 238 Ark. 72, 378 S.W.2d 655 (1964); and *Red Lobster Inns, Inc. v. Lawyers Title Ins. Corp.*, 492 F.Supp. 933 (E.D.Ark.1980), *aff'd in part and rev'd other grounds*, 656 F.2d 381 (8th Cir.1981). The first case, *Dorr v. Fike, supra,* simply has no bearing on the matter at all. Its only relevance to the discussion is a mention in passing that a physician impliedly contracts that he will treat a patient with due care. It does not purport to answer whether a concurrent remedy for breach of that duty sounds in contract.

In citing *Derby v. Blankenship, supra,* plaintiffs have chosen an eminent authority (Justice Leflar) but the wrong case. In that opinion, an insurance agent promised to insure his client against liability imposed by the Worker's Compensation laws, and failed to do so. The facts suggested that the client told the agent that he did not want to start his sawmill operation until the insurance was placed, and gave him a $262.50 check that day for a binder. Two to three weeks after this took place, a worker was injured, and the employee took action against his insurance agent to recover the money owed to the worker. There is some doubt, due to the fact that consequential damages were awarded for the breach, whether this action truly sounded in contract, *see,* discussion of "tacit agreement"

rule, *supra*, at Count 4, and *infra*. That is, the damages recovered by the employee were not such as are in Arkansas ordinarily recoverable for breach of contract.

█ Be that as it may, the opinion appears to read as though the action were maintained in contract. This presents no problem, though, because the defendant did *not* perform his promise; that is, the essence of the action lay in defendant's utter failure to perform. As previously indicated, and as will later be developed, the failure to perform a promise implied in a professional relationship sounds in contract, rather than in tort. Finally, the court questions the applicability of the law regulating commercial relationships between a customer and his insurance agent to a situation involving the rendition of professional services.

To the same effect as *Derby* are *Midwest Mutual Ins. Co. v. Arkansas National Co.*, 260 Ark. 352, 538 S.W.2d 574 (1976); and *Lawrence v. Francis*, 223 Ark. 584, 267 S.W.2d 306 (1954), except that in *Midwest Mutual, supra,* the parties stipulated that the action was one in tort. That itself made any discussion of contract theories superfluous, except insofar as a discussion of contract law is inevitable whenever tortious misfeasance upsets an initially consensual relationship.

In *Rhine v. Haley, supra,* both nonfeasance and misfeasance appeared in one case, under two separate engagements. Mrs. Haley hired lawyer Rhine to protect her interests in a divorce case against Dr. Haley, who, at the time the action against her attorney commenced, lived in parts unknown with his second wife. Mrs. Haley charged that Rhine was initially negligent in failing to provide security for her debts under a property settlement agreement. When the doctor departed, she held only his I.O.U. She further charged that after the decree was entered and before the doctor left, she engaged Rhine to collect her debts from Dr. Haley, and that Rhine did nothing. This breached the contract by non-performance. This court does not suggest that *all* the confusion wrought by

*Rhine v. Haley* stems from this circumstance, but certainly some of it does. The impressive aspect of *Rhine* is that even where both misfeasance and nonfeasance in the context of two different professional engagements are alleged, the Supreme Court treated them not as sounding either in tort or contract, but in tort alone! This is the impact both of the award of tort damages in the case, which was affirmed *sub silentio*, and of the opinion's statement, 238 Ark. at 85, 378 S.W.2d 655, that "Although [Mrs. Haley's] claim against [Dr. Haley] was on contract, her claim against [lawyer Rhine] was in tort, on the theory that [he] was guilty of negligence." This case is particularly slim authority for the proposition that one may sue his accountant either in tort or contract for misfeasance; indeed, the case strongly suggests that no contract action is allowed, without, of course, so holding.

Finally, the plaintiff suggests that *dicta* in *Red Lobster Inns v. Lawyers Title Ins. Corp., supra,* supports its argument that a cause of action in contract may lie against a negligent professional. One familiar with Arkansas law may strongly infer that plaintiff Red Lobster urged the court to allow its action to proceed in tort, whereas defendant Lawyers Title wanted the action to be heard in contract. By way of background, Red Lobster contracted with Lawyers Title to abstract properties it desired to buy, and as a special engagement under that contract, desired that it be informed of any use restrictions that would disable it from operating a restaurant in a particular location. Lawyers Title failed to abstract a "no restaurant" covenant in a prior deed, and as a result, Red Lobster was delayed in opening some five or six months, and therefore lost profits of $78,000 or so. As previously stated Arkansas law holds that before a defendant may be held liable for special damages such as loss of profits, it must appear that at the time of the contract he knew of the special circumstances out of which the damages would arise, and furthermore, that he tacitly agreed to be bound to more than ordinary damages in

case of default on his part. *Hawkins v. Delta Spindle of Blytheville*, 245 Ark. 830, 835–36, 434 S.W.2d 825 (1968). This holding was recently re-affirmed in *Bankston v. Pulaski County School District*, 281 Ark. 476, 480, 665 S.W.2d 859 (1984). Consequently, the Red Lobster plaintiff did not want his case in contract, since such a sounding would limit his damages to, at most, the diminished value of the property, probably a few thousand dollars at most. Judge Woods held that he might sue in tort.

Furthermore, to the extent that *Red Lobster* could ever be considered a contract case, it would be so considered because of a factor not present on the face of those pleadings: the Red Lobster pleadings contained a "special engagement", *i.e.* to search for and report all relevant use restrictions on the subject properties. This duty was expressly contractual, and existed separate and apart from any general duty of ordinary care implied by law. To the extent, then, that *Red Lobster* allowed a plaintiff to sue for the non-performance of a special engagement in tort, rather than confining his remedy to contract, the defendants' position on this motion is bolstered rather than weakened.

Defendants argued, the magistrate opined, and the plaintiffs do not really seem to contest that the "majority rule" and "better rule of law" is that misfeasance in the context of a contract for professional services sounds exclusively in tort, *see Cherokee Restaurant, Inc. v. Puisar*, 428 So.2d 995, 997–98 (La.App.1983). As mentioned, plaintiff suggests on the strength of the five cases treated above that concurrent remedies are all allowed in this state. The foregoing discussion of these precedents leaves the court unconvinced that Arkansas departs from the majority rule.

Whether an action may be allowed to proceed in tort or contract is an issue relicted from days of yore when barristers fought pleading wars under the old forms of action. As Judge Arnold of our district, quoting Lord Raymond, C.J., in *Reynolds v. Clark* (1725) 1 Strange 634, at 635 said: "It was deemed necessary to 'keep up the boundaries of actions' or the unthinkable would happen: 'we shall introduce the utmost confusion.'" Arnold, *Select Cases of Trespass from the King's Courts 1307–1399*, London, Selden Society, 1985, ix, n. 1. The court has considerable sympathy for Lord Raymond, indeed for Chicken Littles everywhere, having worked through the arguments and authorities advanced by counsel. Today's case bears pleasing witness to the progress we as a people have made in streamlining the litigation process over the past two-and-a-half centuries. What formerly would have taken over a year—*i.e.*, to require a validly served defendant to answer over after demurrers, traverses, etc., etc.—now only takes thirteen months or so. "The forms of action are dead," said Maitland, "but they rule us from the grave."

Perhaps in an attempt to undo the sort of confusion that obtains when arguments erupt over whether a suit may "sound" in tort or contract or both, the Arkansas Supreme Court has said, in *Atkins Pickle Co. v. Burrough-Uehrling-Brassuell*, 275 Ark. 135, 138, 628 S.W.2d 9 (1982): "The purpose of the law of contracts is to see that promises are performed; the law of torts provides redress for various injuries ..."

█ It appears in this case that the plaintiff's complaint protests the injury caused by bad performance moreso than the failure to embark upon a promised course of performance. The complaint therefore sounds in tort, and not in contract, *see, e.g., Miller v. Mintorn*, 83 Ark. 918 (1904).

## COUNT VI: VIOLATION OF FEDERAL AND STATE SECURITIES LAWS

The sixth count of the consolidated complaint charges the defendants with state and federal securities laws violations. The count asks for damages on behalf of both the class and the Co-op. The court has initial difficulty understanding how the Co-

op can be an injured party in a securities fraud case.

First, the complaint generally alleges that with respect to the sale of the Co-op demand notes, the purchasers were defrauded by being told that the corporation's financial picture was healthier than it was. An investor might very well be willing to invest his funds at 6 or 7% in a sound and healthy institution, but if he were asked to entrust his money in an insolvent or nearly insolvent business, he might require a very much higher rate of return on his money, or he might forego entirely investing in the enterprise. Under this analysis, the Co-op *actually profited* from the sale of demand notes, since it acquired capital at a much cheaper price than it would have to pay in an arm's length, market transaction, stripped of fraud.

The plaintiffs suggest that the Co-op was artifically maintained in its existence by White *et al* so that White could loot the company, and thereby suffered damage. If so, the damages were not suffered "in connection with" the purchase or sale of a security. They happened *subsequent to* the sale, and not even as a result of the sale. For this reason, a cause of action for the Co-op for violation of Section 10, and Rule 10(b)(5) of the Securities Exchange Act of 1934 must be dismissed. The Co-op suffered no damage "in connection with" the transaction; to the extent that it later became arguably liable for damages to shareholders and investors, this damage was not suffered in connection with the sale. *See, generally, In re Investors Funding Corporation of New York Securities Litigation*, 523 F.Supp. 533, 539–40 (S.D.N.Y.1981).

The Securities Act of 1933 prohibits a party from selling unregistered securities through the mails or in interstate commerce, or those without qualifying prospectuses. 15 U.S.C. Sec. 77e. In the event that such a security is *sold* without registration on prospectus, the buyer may, at his election, sue to recover *the considera-* *tion paid* for such security. 15 U.S.C. Sec. 77l. The complaint does not allege that the Co-op bought securities, or that it suffered any damage from buying the securities. Therefore, the Co-op would be limited by the language of 15 U.S.C. Sec. 77l (2) to recovering the consideration paid less any income received, plus interest. If he no longer *owns* the security, he may sue for damages.

The Co-op asks damages for *indemnification* on the theory that *if* the class plaintiffs are successful in "rescinding" the transactions under federal law they will *owe* the plaintiffs the amount invested plus interest, or under state law the amount owed plus six percent interest. Ark.Stat. Ann. Sec. 67–1256 (1980 Repl.). That is, the Co-op complains that it will have to pay, as damages, less than it would have had to pay for the use of the money if it had applied for it through normal commercial channels. There can be no question but that all funds collected by the Co-op were used by it for corporate purposes, except perhaps those "looted" by White and White-related enterprises in "sweetheart deals" (Par. 47–49). If these "demand notes" did *not* contain on their face an unconditional promise to repay the amounts advanced with interest—if in short they were a typical speculative security in which the investor takes a risk that stock prices will "fall"—then the court could have more sympathy with the concept that the Co-op had suffered injury from the acts of the defendants. That is, the Co-op *by law* would be obliged to pay an amount of money, because its directors sold unregistered stock, which it would not otherwise have been obliged to pay under its contract with its shareholder. But in this case, the Co-op's contract with its investor specifies that *it will* pay the face amount of the note, plus interest. The Securities Act of 1933 adds nothing to the Co-op's liability than that which it had already agreed to assume at the moment the note was issued. For reasons discussed generally in *Cenco, Inc. v. Seidman &*

*Seidman,* 686 F.2d 449, (7th Cir.1982), the court believes that the Co-op has not, under the pleadings, suffered injury or damage as a result of these acts, and that its cause of action should therefore be dismissed; alternatively, the Co-op, as a "seller" does not have a cause of action under the Securities Act of 1933, and its damages, if any, were not suffered "in connection with" the sale of a security under Sec. 10 and Rule 10(b)(5) of the Securities Exchange Act of 1934.

■ With respect to the class's claims under federal and state securities laws, the court is aware of the contentions by the defendants that the Co-op demand notes are not "securities" within the meaning of the statutes. The court is open to argument on this point, but not at this time. The statutes all define a "security" as a "note" or "evidence of indebtedness," 15 U.S.C. Sec. 77b(*l*), 15 U.S.C. Sec. 78c(a)(10), Ark.Stats. Ann. Sec. 67–1256 (1980 Repl.). The court can certainly appreciate how the legislatures might very well conclude that a broad-scale, uninsured, unregulated investment program such as the Co-op offered requires a measure of protection for the public such as might be obtained through registration, with and civil liability imposed for fraud or misleading statements, as well as failure to submit one's self to registration and oversight.

The court will therefore overrule the defendant's objections to Count VI of the Complaint, saying that the class states a cause of action against the defendants. The court will reserve for summary judgment any questions defendants may wish to raise concerning the applicability of the statutes to the demand note program, the individual liability of defendants cited by the Complaint (*i.e.*, Rimmer) and limitations questions—as well, of course, as any questions which the parties otherwise feel resolvable by summary judgment. The record is not developed to the point that the court feels confident that matters as grave as these can be resolved in summary fashion at the pleading stage.

## COUNTS VII & VIII: FRAUDS, MISREPRESENTATIONS AND BREACHES OF FIDUCIARY DUTIES

Counts seven and eight charge that Ball and Mourton constructively defrauded the Co-op by representing both it and Jack White, and assisting him in transferring White Flame to the Co-op and releasing him from his $4 million obligation on notes guaranteed by him between January and December, 1980. As discussed in Count I, *supra,* these causes of action belong to the Co-op and not to the class. They will therefore be dismissed as to the class. The Co-op will be allowed to proceed on these causes of action in its own name.

## COUNT IX: CITIZENS BANK CAUSE OF ACTION

This matter is moot and awaits presentation of apt orders from counsel from the Co-op and the Citizens Bank of Van Buren.

## COUNTS X & XI: NEGLIGENCE BY DIRECTORS AND ATTORNEYS

Count X charges negligent, but nonfraudulent, directors with damages suffered by the Co-op as a result of mismanagement; Count XI charges the Co-op's attorneys (Ball and Mourton, Creekmore and Harriman) with negligently advising the Co-op in the conduct of its affairs. These counts may only be asserted by the Co-op, not the class, for reasons discussed in the discussion of this issue in Count I, above. The class claims will be dismissed; the Co-op will be allowed to proceed, subject to any future motions for summary judgment regarding the statute of limitations, etc.

## COUNT XII

In Count XII, the Co-op and the class assert a claim against the attorneys for breach of contract by negligent perform-

ance. For reasons advanced in the discussion with respect to Count V, this cause of action is dismissed as to both the Co-op and the class.

## COUNT XIII

The plaintiffs' cause of action embodied in Count XIII of the consolidated complaint charges all defendants with R.I.C.O. violations causing damage to the Co-op and the class. The R.I.C.O. pleading appears to identify February, 1980, as the starting point of the scheme to defraud (Par. 160). This would coincide with the "back dated" sale of White Flame to the Co-op, or the approximate point at which the Co-op began making unauthorized loans to White to enable him to operate the gasohol plant, loans which ultimately totaled $4 million before they were finally "forgiven" in the Chancery Court action.

The plaintiffs allege that the defendants, through a pattern of racketeering activity, damaged the Co-op by foisting off on it a worthless asset driving it into insolvency. At the point of insolvency, the fraud, which initially operated against the Co-op's interest alone, began to inflict damage on the demand note holders who extended credit to the entity based on the representation that their funds were safely placed with a solvent and trustworthy enterprise.

The alleged R.I.C.O. violations, then, had serial victims: first the Co-op, then the noteholders, whose capital was needed to allow the Co-op to proceed in business so that the perpetrators of the initial fraud could better conceal their actions. As the court has noted in its discussion of Count VI (the allegation of securities fraud) at the point of insolvency the Co-op became an engine of fraud, not a victim of fraud. The demand note program permitted the Co-op access to capital at a lower rate of interest than it would have been able to get in the market, and this was so, according to the complaint, because the Co-op successfully misrepresented its condition to the noteholders.

Counsel for Moody has argued that the class may not prosecute a R.I.C.O. claim in addition to the one prosecuted by the trustee. *Carter v. Berger,* 777 F.2d 1173 (7th Cir.1985). The situation in *Carter* was quite different, however. The damages to the class did not necessarily result from damages to the defrauded entity, *see* 777 F.2d at 1177. Even if they did, the court adopted the "passing on" rule of the antitrust law to allow only the directly injured party to sue. *Cf. Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Here the damages are totally distinct, and with respect to the use of the mails to solicit or defraud in the context of demand note investments, class members are the only "injured party" and therefore the "real party in interest" for such damages under F.R.C.P., Rule 17(a).

A number of other objections have been presented by various defendants with respect to the R.I.C.O. claims. Accountant and lawyer defendants have disputed the assertion that they "controlled" the Co-op so as to defraud any class members, *citing Bennet v. Berg,* 685 F.2d 1053 (8th Cir. 1982). On remand, the district court in *Bennet v. Berg,* 80–381–CV–W–O (W.D.Mo. June 21, 1984) found the requisite "control" existed under the amended pleadings. This court does not feel bound by that resolution in any sense. It merely notes that "an argument" can be made that non-directors and non-employees of an enterprise can "control" it. In this case, the pleadings make more than an argument that lawyers, for example, controlled the affairs of the Co-op enterprise. The complaint alleges that White "dominated" the Board, and that his lawyers (who were also the Co-op's lawyers) drew up the pleadings which foisted White Flame off on the Co-op. The complaint alleges that this was a $4–7 million transaction, a quite sizeable one relative to the total assets of the Co-op. It could not have been finalized "but for" the activities of the lawyers in concert with White, a dominating party. The complaint

alleges sufficient control over the Co-op through White to take plaintiffs past the pleading stage *vis a vis* the attorneys. Similar, albeit not as forceful arguments can be made with respect to the accountants.

■ In short, the court believes that the complaint states a R.I.C.O. cause of action against the defendants. Defendants wishing to submit summary judgment arguments on issues such as "control" or "aiding" or limitations, etc., are certainly invited to do so. To dismiss the complaint at this point, however, would in many if not all cases be giving ear to speaking demurrers. Because the complaint adequately states a cause of action against all defendants, their motions are overruled.

## COUNT XIV: VIOLATION OF "LITTLE FTC" AND CONSUMER PROTECTION ACTS

■ Count XIV alleges that defendants violated the Consumer Protection Acts of Arkansas and Oklahoma by selling the demand notes by means of misrepresentations. Ark.Stat.Ann.Sec. 70–913 removes from the purview of the Consumer Protection Act those transactions governed by the State Commissioner of Securities. The Arkansas statute, therefore, has no application to this situation.

■ The Oklahoma Statute does not contain the same language as Arkansas'. The court is convinced, though, that it does not apply. Indeed, only the rare state consumer protection statute concerns itself with sales of securities. *See, Swenson v. Englestad,* 626 F.2d 421 (5th Cir.1980) (stock certificates not "goods or tangible chattels" under Texas act.)

■ To the extent that the state acts may be seen as prohibiting lawyers and accountants from "any deception, fraud ... in connection with the sale or advertisement of any goods or services," *see* Ark. Stat.Ann.Sec. 70–904, the complaint is void

of any allegation that any lawyer or accountant fraudulently induced the Co-op to secure his services. Alternatively, the court believes that this statute was not designed to regulate the lawyer-client or accountant-client relationship.

In short, all causes of action, whether raised by the Co-op or the class, brought under the consumer protection acts of Arkansas or Oklahoma will be dismissed.

## COUNT XV: VIOLATION OF ARKANSAS CRIMINAL CODE

The law of Arkansas does not imply a private right of action for violation of misdemeanor statutes. Ark.Stat.Ann.Sec. 41–2307 (1977 Repl.) which criminalizes the offense of receiving deposits in a failing financial institution, has no application to the facts alleged in the complaint, which recites that the Co-op is a "co-operative corporation" (Par. 1), not a financial institution.

## COUNT XVI: TRANSFERS BY INSOLVENT IN VIOLATION OF ARKANSAS COMMON LAW

■ This cause of action seeks to avoid all transfers which caused the Co-op to become insolvent. The count infers that the White Flame transfer is mentioned in this context. The court is inclined to dismiss this cause of action, since it is reliably informed that the trustee has filed suit against the architects, designers, builders, etc. of the White Flame plant for breach of warranty, etc. The court views such a lawsuit as amounting to a ratification of the transfer. Either this lawsuit, or the other one against A.C.R., etc., needs to be dismissed. The court will therefore dismiss this cause of action, giving plaintiffs ten days to file an amended pleading specifying which transfers, if any, it wishes to avoid, and whether such an action should be filed in bankruptcy court first, or in this court as an original matter apart from bankruptcy.

COUNT XVII: FORFEITURE OF COMPENSATION BY CO-OP OFFICERS AND DIRECTORS

 This cause of action asks that Co-op officers and directors forfeit their pay because of their breach of fiduciary duties. This action may be maintained by the trustee, but not by the class.

### D. SUMMARY

The court has acted to clarify which causes of action belong to whom, rather than to pass on questions of the sufficiency of pleadings which, at times, appeared conclusory on questions of "control" of an enterprise, etc., etc. The court's reasons were manifold. Primarily, the court hopes to prepare this lawsuit for trial in the most fair, expeditious, and efficient way possible. To require more pleading is counterproductive. This court has gone on record as supporting sanctions under Rule 11 against any party or attorney who persists in keeping a party in a lawsuit, or maintaining a spurious defense, after it has become apparent through discovery that the claim or defense is no longer justified by the evidence. The court trusts that the parties will examine their case with this admonition in mind, and make whatever adjustments as will further promote the orderly resolution of this dispute.